NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____  :
                                 :
Abdul-Halim N. SHAHID,           :
         Petitioner,             :
                                 :   No. 02-6107 (WGB)
v.                               :
                                 :   O P I N I O N
Terrance MOORE, et al.,          :
         Respondents.            :
_____  :
```

APPEARANCES:

Abdul-Halim N. Shahid
Prison Number: 76248
Lock Bag-R
Rahway, NJ  07065

     Pro Se Petitioner

Donald C. Campolo
Acting Essex County Prosecutor
Essex County Courts Building
Newark, NJ  07102

     Attorney for Respondents

**Bassler, Senior District Judge**:

     Petitioner Abdul-Halim N. Shahid ("Petitioner"), formerly Gerald Gooding, files this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1984, Petitioner was convicted of felony murder, robbery, and possession of a weapon for the purpose of using it unlawfully.  After appealing his conviction through the state court system and filing four separate requests for Post Conviction Relief ("PCR"), Petitioner

now seeks relief in this Court.  He claims that (1) the admission of certain in-person and photographic identifications into trial violated his right to due process and a fair trial rights; (2) he was denied the effective assistance of counsel; (3) the trial court's failure to define the elements of criminal attempt in its jury instruction on robbery violated his rights to due process and a fair trial; (4) the improper and prejudicial remarks made by the prosecutor during the summation violated his rights to due process and a fair trial.

For the reasons set forth in this opinion, Petitioner's petition for habeas relief is **denied.**

I. <u>Factual Background</u>

The crime with which Petitioner was charged occurred approximately 4 a.m. on February 18, 1984.  The victim, Bernard Cruder ("Bernard"), and his adult son, Robert Cruder ("Robert"), were in their parked vehicle on the corner of Miller Street and Broad Avenue in Newark, New Jersey.  Bernard was sitting in the front seat, and Robert was sitting in the back seat receiving oral sex from a male prostitute.  A few minutes later an assailant, armed with a knife, entered the rear of the vehicle and demanded their money.  Bernard and Robert struggled with the assailant.  During the struggle, Bernard was stabbed, and the assailant was also injured.  After the assailant fled from the scene, Robert drove Bernard to St. James Hospital where Bernard

died shortly after arrival.  While at the hospital, Robert gave a description of the assailant to the police.  The police matched the description to Petitioner.  Petitioner had just been taken to Beth Israel Hospital, alleging that he had been the victim of a street mugging.  After Robert identified Petitioner at the hospital and again in a photographic identification, the police arrested Petitioner.

A jury convicted Petitioner of felony murder, first degree robbery, and third degree possession of a weapon for the purpose of using it unlawfully.  The trial court merged robbery conviction into the felony murder conviction and sentenced Petitioner to a term of 30 years without parole eligibility.  The court also sentenced Petitioner to a concurrent term of five years on the weapon conviction.

II. Procedural Background

Tried to a jury, Petitioner was convicted on May 24, 1984.  On direct appeal, Petitioner unsuccessfully argued that: (1) the trial judge erred in admitting Robert's out-of-court identifications, and (2) acts of prosecutorial misconduct committed during the summation were improper and prejudicial.

On June 19, 1986, the Appellate Division, in a per curium decision, affirmed the decision of the trial court on both issues.  The New Jersey Supreme Court denied certification on

March 21, 1988.  The issues contained in Petitioner's direct appeal are claims one and four of his habeas petition.

On October 6, 1989, oral arguments were held for Petitioner's first petition for PCR.  There, Petitioner claimed that he was denied effective assistance of counsel as guaranteed under the Sixth Amendment of the United States Constitution.  The court denied relief and Petitioner did not appeal the decision.

Petitioner subsequently filed a second petition for PCR, but Petitioner does not raise those issues in his habeas petition.

In 1993, Petitioner filed a third petition for PCR. He claimed ineffective assistance of appellate and trial counsel. The trial court dismissed the petition on the basis that the ineffective assistance of appellate counsel argument claim should be decided by the Appellate Division.  The Appellate Division remanded Petitioner's third petition for PCR and ordered the trial court to fully dispose of the issue.  On September 2, 1998, the trial court denied Petitioner's third PCR petition on the merits.  The court also concluded that the claim was procedurally barred from relitigation pursuant to New Jersey Court Rules 3:22-5, because the claim was adjudicated on the merits before, and 3:22-4, because the claim could have been raised in a prior proceeding.  On September 2, 1998, Petitioner appealed.  On February 24, 2000, the Appellate Division affirmed the holding of the trial court.  On June 7, 2000, the New Jersey Supreme Court

4

denied Petitioner's petition for certification.  Portions of the claims in the third PCR petition make up the second claim in his habeas petition.

On March 28, 2001, Petitioner submitted his fourth petition for PCR petition, claiming ineffective assistance of counsel, denial of due process, and denial of the right to a fair trial because the jury was not instructed on the law of attempt concerning the robbery charge.  In July 2001, the trial court denied the petition and concluded that the petition was procedurally barred by the five-year limitation period enunciated in Rule 3:33-12.  Additionally, the claim was barred by Rule 3:22-4 because it could have been raised in prior proceeding.  On September 19, 2002, the Appellate Division affirmed the denial. On November 15, 2002, the New Jersey Supreme Court denied certification.  Portions of the claims in the fourth PCR is the fourth claim in his habeas petition.

On January 7, 2003, Petitioner filed this petition seeking habeas relief from this Court pursuant to 28 U.S.C. § 2254.

III. <u>Discussion</u>

     A.   <u>State Procedurally Barred Claims</u>

     In the third petition for PCR, Petitioner raised the ineffective assistance of counsel claim.  The state court held that the claim has been adjudicated on its merits previously, thus barring the claim pursuant to New Jersey Court Rule 3:22-5.

Furthermore, because it should have been raised in prior proceeding, the claim was barred pursuant to Rule 3:22-4. In his fourth petition for PCR, Petitioner claimed he was denied due process and a fair trial because the jury was not instructed on the law of attempt for the robbery charge. The state courts barred the claim because it was filed after the five-year limitation period pursuant to Rule 3:22-12.

In a case where the state court has dismissed a petitioner's claims on procedural default, the "federal habeas court is barred by the procedural default doctrine from considering the claims, unless the habeas petitioner can show 'cause' for the default and 'prejudice' attributable thereto." Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004) (internal citation omitted). The procedural default "must rest on 'adequate and independent' state law grounds." Id. (quoting Harris v. Reed, 489 U.S. 255, 262 (1989)).

A state procedural default will not bar federal habeas relief if the state law ground is so "interwoven with federal law" that it can not be said to be independent of the merits of a petitioner's federal claims. Coleman v. Thompson, 501 U.S. 722, 740 (1991). The Supreme Court sets out in Harris the "plain statement" test for such determination. Harris, 489 U.S. at 261-63. The test was narrowed by Coleman. The federal habeas court must first determine whether the decision of the last state court

to which the petitioner presented his federal claims "fairly appears to rest primarily on federal law, or to be interwoven with the federal law." Coleman, 501 U.S. at 735.  If there is such a reliance on federal law, the federal habeas court will then determine whether the state court clearly and expressly based its ruling on a state procedural ground.  Id.

The last court to render judgments on both of the claims at issue here were the New Jersey Supreme Court, which denied Petitioner's petitions for certifications.  These judgments, however, simply affirm the lower court's holdings.  Thus, according to the Supreme Court's instruction, this Court must look to the "last explained state-court judgment on the . . . claim" to determine whether the court's decision "fairly appears to rest primarily on federal law" or instead relies upon a state procedural bar to deny relief.  Ylst v. Nunnemaker, 501 U.S. 797, 802, 805 (1991); Pinchak, 392 F.3d at 557.  Here, the Appellate Division rendered the last explained judgment on the ineffective assistance of counsel claim in its February 24, 2000 Opinion; the Appellate Division rendered the last explained judgment on the due process claim in its September 19, 2002 Opinion.

In its February 24, 2000 Opinion the Appellate Division affirmed the trial court's holding by emphasizing Petitioner did not provide adequate evidence to establish ineffective assistance of counsel.  The holding rested on federal law.  State v. Shahid,

A-1280-98T4, at 4.  Furthermore, the court did not explicitly
state its ruling was based on state law.  Therefore, this Court
is not barred from reviewing the ineffective assistance of
counsel claim.

In its September 19, 2002 Opinion the Appellate Division
affirmed the trial court's holding and stressed "[Petitioner's]
petition for the fourth PCR was filed well beyond the five-year
time limitation established by R.3:22-12 and is thus time
barred."  State v. Shahid, A-000005-01T3, at 3.  The procedural
bar rested on an independent state law ground, and the Appellate
Division was explicit in its reliance on state law for the
ruling.  Therefore this Court is barred from reviewing the claim.
See Pinchak, 392 F.3d at 557 (Rule 3:22-12 is an independent
state law basis for the state court to deny a claim).[1]

---

[1] Even if the Court were to consider the merits of his third
claim, Petitioner would not be entitled to relief.  It is well
established that habeas relief cannot be granted simply because a
state court failed to give an appropriate jury instruction.
Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005) ("the relevant
question is . . . not merely whether the instruction is
undesirable, erroneous, or even universally condemned").
Instead, the federal habeas court can only grant habeas relief if
the omitted instruction "so infected the entire trial that the
resulting conviction violates due process."  Cupp v. Naughten,
414 U.S. 141, 147 (1973).  The Court of Appeals for the Third
Circuit has held that a trial error is harmless unless the
federal habeas court conclude that or has "grave doubt" as to
whether the error had a substantial and injurious effect in the
jury's determination of the verdict.  Bronshetein v. Horn, 404
F.3d 700, 712 (3d Cir. 2005); see also O'Neal v. McAninch, 513
U.S. 432, 437 (1995);  Brecht v. Abrahamson, 570 U.S. 619, 637
(1993).  Petitioner has not demonstrated that the error infected

        B.    Standard of Review

    A federal habeas court has jurisdiction to review a state prisoner's petition for habeas relief "only on the grounds that the petitioner's confinement violates the Constitution, law or treaties of the United State."  U.S.C. § 2254(a); see also McCandles v. Vaughan, 172 F.3d 255, 260 (3d Cir. 1999).  "It is not the province of a federal habeas court to reexamine state court determinations on state law questions."  Estelle v. McGuire, 502 U.S. 62, 68 (1991).

    In addition, a federal habeas court can only entertain a habeas petition if all available state remedies have been exhausted.  28 U.S.C. § 2254 (b)(1).  "To satisfy the exhausting requirement [the] [p]etitioner must 'fairly present' all federal claims to the highest state court before bringing them in federal court."  Stevens v. Del. Corr. Ctr., 295 F.3d 361, 369 (3d Cir. 2002) (quoting Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002)); see Picard v. Connor, 404 U.S. 270, 276 (1971).  When the petitioner has presented to the state court "in substance" the same claim he seeks for review by the federal habeas court, he

---

the whole trial.  First, he relies upon a New Jersey state court case, State v. Gonzales, 318 N.J. Super. 527 (App. Div. 1999), cert. den. 161 N.J. 148 (1999), that is distinguishable and not binding on this Court.  Second, he argues that the felony murder and weapons possession charges were predicated on the robbery charge, which was invalidated when the jury was not instructed on attempted robbery.  This claim is merit-less because the facts unequivocally show there was an attempted robbery.

has exhausted his state remedies, even if the state court "fail[ed] to rule on the merits of a claim." Pinchak, 392 F.3d at 555; see Picard, 404 U.S. at 276; Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984).

Petitioner has presented all four claims to the New Jersey Supreme Court, either through direct appeal or collateral appeal. Thus, the exhaustion requirement is met for all the claims.

Once the exhaustion requirement is met, a federal habeas court can grant habeas relief only if the state court's decision is (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding". 28 U.S.C. § 2254. The Third Circuit Court of Appeals enunciated a two step test for evaluating the "contrary to" and "unreasonable application" clause. Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999); see Williams v. Taylor, 529 U.S. 362, 410 (2000) ("contrary to" and "unreasonable application" are two independent tests and must be considered separately). First, the federal habeas court must determine if the petitioner demonstrated that the Supreme Court precedent requires the contrary outcome. Id. If not, then second, the federal habeas court must determine whether the decision was based on an "unreasonable application"

10

of the Supreme Court precedent.  Id.  Meaning, if the state
court's decision was "evaluated objectively and on the merits,"
the holding "cannot reasonably be justified."  Id.

    1.  Claim One

Petitioner claims that the admission of the in-person and
photographic identifications into trial violated his right to due
process and a fair trial.[2]  Petitioner specifically refers to
Robert's in-person identification of Petitioner as the assailant
in Beth Israel Hospital and the subsequent photographic
identification at the police station.

The question is whether the identification procedures were
"so unnecessarily suggestive and conducive to irreparable
mistaken identification that [Petitioner] was denied due process
of law."  Stovall v. Denno, 388 U.S. 293, 302 (1967).  The court
must prevent "identification procedure so impermissibly
suggestive as to give rise to a very substantial likelihood of

_____

[2] Petitioner also argues that his due process rights were
violated because the "eye-witness" did not testify at the Wade
hearing. A Wade hearing is a hearing pursuant to United States v.
Wade, 388 U.S. 218, 227 (1967).  It is used to determine whether
any pretrial confrontation potentially substantially prejudice
the defendant. Id.  Petitioner's argument is based on his
erroneous interpretation of Stovall v. Denno, 388 U.S. 293, 297
(1967).  Stovall only requires a "meaningful examination of the
identification witness's testimony at trial," id., which is
satisfied by the testimonies of the detectives who were present
at the identification.

irreparable misidentification." Neil v. Biggers, 409 U.S. 188, 197 (1972) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). The Supreme Court in Manson v. Brathwaite, 432 U.S. 98, 110 (1977), required the court to decide the admissibility of the evidence "on the totality of the circumstances." The out-of-court identification is admissible if, "despite the suggestive aspect, [it] possesses certain features of reliability." Id.; United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995). Reliability is the "linchpin in determining the admissibility of identification testimony." Manson, 432 at 114.

Biggers enunciated the five factors for weighing the reliability of the identification: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Biggers, 409 U.S. at 200-01; see also Emanuele, 51 F.3d at 1128. If the identification is unnecessarily suggestive and unreliable, then "the admission [of the identification]... violates the due process clause." Emanuele, 51 F.3d at 1127-28. When such violation occurs, the court must "consider whether this constitutional error was harmless." Id.

The Court will first address whether the photographic and

in-person identifications are unnecessarily suggestive.  The
photographic identification is not suggestive.  There is no
evidence to support Petitioner's argument that Robert's
identification was tainted by the earlier identification at the
hospital.  First, Robert did not see Petitioner's face at Beth
Israel Hospital because it was partially covered by a sheet.
Second, the photographic identification took place at the police
station.  The detectives randomly shuffled six photographs,
placed them in a stack and did not tell Robert which photograph
to pick. (2T39:15 to 19; 97:20 to 98:7.)  Robert independently
identified Petitioner as the assailant.

     The in-person identification at Beth Israel Hospital,
however, was suggestive.  Officer Black had taken Petitioner to
Beth Israel Hospital to treat various injuries.  Officer Black
heard the dispatcher broadcast that the police were looking for a
suspect involved in a stabbing that fit Petitioner's description.
He instructed the detectives to bring Robert to the hospital to
identify the suspect.  When Robert arrived at Beth Israel
Hospital with the two detectives, Officer Black told the
detectives, that he had someone in his custody who fit their
suspect's description.  (2T 83:12 to 25.)  It is unclear from the
record whether Robert was either with the detectives at the time
of this conversation or could have overheard the conversation.
Petitioner was then carried on a stretcher to Robert, where he

identified Petitioner as the assailant.

Robert testified that the detectives did not tell him or suggest to him that the man they brought out for identification was the assailant. (2T45:8 to 17.) Petitioner, however, presents credible counter evidence from Robert's cross-examination. On cross-examination Robert admits that he knew the police were taking him to the hospital to identify a suspect. (2T31:9 to 32:18.) This testimony does suggest that the identification in the hospital was unnecessarily suggestive.[3] Also, "the practice of showing suspects singly to persons for the purpose of identification ... has been widely condemned." Stovall, 388 U.S. at 302. Accordingly this Court will evaluate the five reliability factors from Biggers to ensure that the admission of the in-person identification did not violate Petitioner's right to due process and a fair trial.

(1) The Opportunity of the Witness to View the Assailant at the Time of the Crime

From the time the assailant entered the car through their struggle, Robert had ample opportunity to see the assailant. In fact, at one point during the struggle Robert was in direct,

---

[3] The one-on-one identification has some similarities with Webb v. Havenor, 549 F.2d. 1081, 1082-83 (6th Cir. 1977), which Petitioner cites. In Webb, the court held the identification was unnecessarily suggestive when the police told the witness they had a suspect for him to identify and then brought the suspect alone into to the room.

close proximity to the assailant's face and had a clear view of
the right side of the assailant's face. (2T24:21 to 25:4; 44:22
to 45:2.) Additionally, the inside of the vehicle was illuminated
by the street light and the car's interior light, providing
adequate light for Robert to see the assailant. (2T18:20 to 19:1;
19:21 to 20:3.)

### (2) The Witness's Degree of Attention

Petitioner argues that Robert could not have paid attention
to the assailant during their struggle because after the incident
Robert was emotionally unstable and could only give a general
description of the assailant.  These arguments are not
persuasive.  While Robert was confused and upset after the
incident, he could have been alert and focused during the
struggle. There is no evidence to reflect Robert's degree of
attention or lack thereof.

### (3) The Accuracy of the Witness's Prior
### Description of the Assailant

When Robert initially described the assailant to the police,
he told them the assailant was a black male, about six feet tall,
180 pounds, and was wearing a brown coat and jeans.[4]  (2T7:17 to

---

[4] In Robert's direct examination he said he told the police
that the assailant was wearing an earing, but in his cross
examination he admitted that he had told the police about the
earing after he identified Petitioner at Beth Israel Hospital.
(2T27:5 to 25.)

8:3.)  Even though Petitioner contends he was wearing a pair of "gray corduroy pants," the description is still accurate. (3T47:21 to 48:2.)  Officer Black was able to correctly identify Petitioner as a suspect from Robert's description.

(4) <u>The Level of Certainty Demonstrated by the Witness at the Confrontation</u>

Although Robert was not certain either time, he twice identified Petitioner as the assailant.  Robert could not identify Petitioner with complete certainty at the hospital because Petitioner's face was partially covered by a sheet, and he was still recovering from the trauma of losing his father and struggling with an armed assailant.  (2T8:19 to 21; 92:1 to 11; 35:5 to 13.)  But at the photographic identification, Robert, again identified Petitioner as the assailant, with relative certainty. (2T14:19 to 23.)  The two consistent identifications demonstrate Robert recognized the assailant as Petitioner. Furthermore, Robert told the detective he could positively identify Petitioner in person.  (2T98:19 to 99:4.)

(5) <u>The Length of Time Between the Crime and the Confrontation</u>

The crime took place at approximately 4a.m. on February 18, 1984.  Shortly thereafter, Petitioner was taken to the hospital, where Robert made the first identification approximately twenty minutes after Petitioner's arrival.  (2T73:23 to 24; 74:17 to 21;

16

75:7 to 10.)  After leaving the hospital and visiting the crime scene a couple of times, the police brought Robert back to the police station.  There Robert identified Petitioner from the photograph array.  (2T37:7 to 14; 96:8 to 15.)  The duration from the crime to the last identification was about five hours.

The Court concludes, from weighing the reliability factors, that Robert's in-person identification of Petitioner as the assailant is reliable.  Therefore, the identifications do not present a "very substantial likelihood of irreparable misidentification."  <u>Biggers</u>, 409 U.S. at 197.  Hence, their admission into trial did not violate Petitioner's right to due process and a fair trial.  As such, the Court need not engage in a harmless error analysis.

    2.  <u>Claim Two</u>

Petitioner asserts that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment.  Petitioner claims that defense counsel fell below an objective standard of professional norms because he failed to: (1) investigate and call key defense witnesses, and (2) contest the state's suppression of favorable evidence.

First, Petitioner claims that counsel knowingly failed to investigate and produce at trial two key witnesses, Dr. Washington and Officer Chieppa.  Dr. Washington was Petitioner's attending physician at Beth Israel Hospital.  Petitioner claims

that his testimony would have been "critical" in establishing
Petitioner as the victim of a separate mugging incident.  He
argues that Dr. Washington could have testified to the severity
of his injuries.  Dr. Washington's testimony would have proven
that he suffered from a triple extreme leg fracture, making
fleeing from the vehicle to the fence, where he was found,
impossible.

The second key witness is Officer Chieppa.  Petitioner
claims Officer Chieppa would also have served to verify that
Petitioner was mugged.  Petitioner asserts that Officer Chieppa
would have told the jury that he was the first officer to arrive
at the scene and would testify to the description Petitioner gave
of his "attackers."  Petitioner further asserts that Chieppa
would have testified to what actions the police undertook to
search for the mugging suspects.

Second, Petitioner claims that counsel failed to contest the
State's alleged violation of Brady v. Maryland, 373 U.S. 83
(1963).  The State did not produce the pants Petitioner was
allegedly wearing at the time of the crime.  Petitioner contends
that because the pants the State has in its possession are
different from the pants described by Robert, the discrepancy
would have undermined Robert's credibility, which is the
"substance of State's case."  (Memo. Law at 36.)  Had the jury
seen the pants, Petitioner believes the jury would have ruled

18

differently.

The Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), provides the proper framework for evaluating an ineffective assistance of counsel claim.  The Supreme Court instructs the federal habeas court to judge ineffective assistance claims by evaluating "whether counsel's conduct so undermined the proper function of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 686 (1984).  The Supreme Court also enunciated a two-part test to evaluate counsel's performance. First, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  <u>Id.</u> at 687 (internal citation omitted).  The standard has been described as "simply reasonableness under prevailing professional norms."  <u>Id.</u> at 690. The judicial scrutiny of counsel's performance must be highly deferential and the court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.  <u>Id.</u> at 689.

Second, the petitioner must prove that counsel's performance so "prejudiced" the defense that the petitioner was deprived of a fair trial.  <u>Id.</u>  To satisfy this criterion, the petitioner must show a reasonable probability that the result would have been different in the absence of counsel's errors.  <u>See</u> <u>id.</u> at 694.  A

19

"reasonable probability is a probability sufficient to undermine [the court's] confidence in the outcome of the proceeding." Id.; United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989). The petitioner needs to satisfy both elements of the Strickland test to establish a claim of ineffective assistance of counsel.

Petitioner fails to meet the Strickland test. In support of his claim that Dr. Washington should have been introduced as a witness, Petitioner relies on Holsomback v. White, 133 F.3d. 1382 (11th Cir. 1998). In Holsomback, the trial counsel failed to investigate pertinent medical evidence, and the Court of Appeals for the Eleventh Circuit reversed the district court's denial of a petitioner's habeas petition. 133 F.3d at 1382. There, the petitioner was convicted of first degree sodomy of his ten year old son. Id. at 1384. The petitioner's counsel accepted the prosecution's claim that there was no medical evidence that the sodomy had occurred and did not investigate the medical evidence. Id. at 1387. The court held that the counsel's decision not to conduct any investigation of the medical evidence of sexual abuse was not reasonable, and it prejudiced the petitioner's defense because the doctor who examined the boy might have had favorable evidence for the petitioner. Id. at 1389.

This case is not analogous to Holsomback. Petitioner did not provide evidence that counsel's action was not a part of reasonable and professional trial strategy. Second, Petitioner

20

provides no evidence to show that Dr. Washington would have given testimony that the petitioner could not have hopped, crawled, or walked away from the crime scene.  Therefore, the omission of Dr. Washington's testimony is a trial strategy that did not prejudice Petitioner's defense.

Similarly, Petitioner's argument that Officer Chieppa's testimony was critical for his defense is also unpersuasive.  The state court correctly concluded that Officer Chieppa's testimony would have been repetitive.  Officer Black also heard Petitioner's description of the mugging suspect and witnessed the police's measure to locate the mugging suspect.  The Court agrees with the state court's conclusion that "the mere fact that the petitioner may have related his story to Officer Chieppa before Officer Black does not however, make the story any more believable.  A lie told twice is no more believable than a lie told once." (PCR Op. 6:12 to 16.)  Petitioner has not provided any evidence to suggest that Officer Chieppa's testimony would have been any different from Officer Black's.  Thus, Officer Chieppa's testimony is unnecessary.

Petitioner's claim that counsel failed to contest the State's Brady violation has no merit.  There was no Brady violation for counsel to contest.  The Supreme Court stated in Brady that "suppression by prosecution of evidence favorable to an accused upon request violates due process where the evidence

is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.  The three main elements of a Brady misconduct claim are: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." United States v. Mitchell, 365 F.3d 215, 254 (3d Cir. 2004) (quoting Banks v. Dretke, 540 U.S. 668, 691 (2004)).

        The issue here is whether the pants were exculpatory evidence, such that its suppression would prejudice Petitioner's defense.  Kyles v. Whitly, 514 U.S. 419, 435 (1995), is the touchstone on evaluating the materiality of the evidence.  Banks, 540 U.S. at 698.  The evidence is material when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.  This standard does not require the court to determine whether the defendant would be more likely than not to have received a different verdict with the evidence. Id. at 434.

        Pursuant to the standard in Kyles, the suppression of the pants did not undermine this Court's confidence in the verdict. The State's case relied on more than just Robert's testimony. For instance, Detective Fultz gave a description of Petitioner's hat

22

and earing that was consistent with Robert's description, (2T102-8 to 23; 2T115-21 to 25; 2T101-2 to 14,).  The male prostitute, who is Petitioner's cousin, also identified Petitioner as the assailant. (2T51:14 to 51:16; 52:2 to 52:7; 59:12 to 59:13). Furthermore, Robert gave a thorough description of Petitioner that included more than just the style of Petitioner's pants; Robert's description was mostly accurate.  Therefore, even though the pants may have benefitted Petitioner, it is not exculpatory evidence.  Their suppression is not a <u>Brady</u> violation. Furthermore, despite Petitioner's claim, counsel understood that the credibility of the witnesses was the substance of the State's case.  The transcripts reveal that defense counsel extensively and vigorously attacked the validity of Robert's identification of Petitioner and even attacked the trustworthiness of the prostitute's eyesight.

The Court finds that Petitioner has not overcome counsel's presumed competence nor has Petitioner proven that, had counsel investigated and litigated the case without the alleged errors, a reasonable probability exists that the result would have been different.  Therefore, Petitioner's Sixth Amendment rights were not violated.

       3.  <u>Claim Four</u>

Petitioner claims the prosecutor made three improper and prejudicial remarks during the summation, which deprived him of a

fair trial.   Specifically, Petitioner asserts that the prosecutor misquoted the testimony of a State witness, vouched for the credibility of State witnesses' testimonies, and asserted personal belief of guilt, while vouching for the credibility of the police.

A prosecutor's improper remarks only violate a petitioner's constitutional rights if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  A federal habeas court must examine the prosecutor's actions in the context of the entire trial, assessing the severity of the conduct, curative instructions, and the quantum of evidence against the defendant. Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 1998) (quoting 28 U.S.C.A. sec. 2254 (d)(1)); see also United States v. Young, 470 U.S. 1, 11 (1985) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in the context of the entire proceedings.").

First, Petitioner claims the prosecutor "proffered a blatant falsification of actual testimony" by stating that Robert saw Petitioner stab his father.  (Memo. Law at 48.)  During the summation, the prosecutor stated, "Robert [ ] knocked

24

[Petitioner] to the ground and that's when he noticed [Petitioner] stabbed his father." (3T86-1-2.)  The record shows during Robert's testimony he stated that he did not see Petitioner stab his father. (2T6-4 to 6.)

Second, Petitioner claims that the prosecutor "prejudicially vouch[ed] for the credibility of [S]tate witnesses." (Memo Law at 45.)  Petitioner quotes prosecutor's comment, "you must believe that they [the State witnesses] came towards you, swore that the testimony they gave [was true,] and deliberately and intentionally lied, because that's what [Petitioner] said." (3T82:23 to 83-1.)

Finally, Petitioner claims that the prosecutor implied "that the testimony of police witness was entitled to special deference ... [and] also imparted a personal a belief in the defendant's [Petitioner's] guilt." (Memo. Law at 46.)  During summation, the prosecutor stated: "The police have nothing against [Petitioner]. Why would they want to convict an innocent man?" (3T89:8 to 10.) In addition, the prosecutor remarked: "to allow a man who is guilty of robbery, murder, possession of a weapon for unlawful purpose to walk out of the courtroom a free man would be the greatest injustice a jury could return." (3T88:8 to 12.)

In support of his claim Petitioner cites <u>United States v. Garza</u>, 608 F.2d. 659,665 (5th Cir. 1979).  In <u>Garza</u>, the Court of Appeals for the Fifth Circuit ordered a new trial for a

defendant, finding that a prosecutor's inappropriate comments during summation amounted to "plain error." Id. at 666. The court noted that most of the prosecutor's summation was used to bolster the credibility of the witnesses. See id. at 663-64. The prosecution continually praised the witnesses as "professional" and "dedicated" men doing the "right thing." Id. at 664. Most significantly, the prosecutor insisted to the jury he personally would not have participated in the trial if the defendant's guilt had not already been determined. Id. The Court finds that the prosecutor's statements here did not amount to the same level of egregious conduct as the prosecutor in Garza.

Although the State concedes that the prosecutor made inappropriate remarks, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (internal quotation marks omitted). The comments did not deny Petitioner a fair trial. When reviewed in the context of the entire trial, the Court finds there was sufficient evidence for the jury to find Petitioner guilty without the prosecutor's inappropriate statements. The physical evidence, combined with the identification of Petitioner by Robert and the male prostitute as the assailant, constitutes credible and sufficient evidence to convict Petitioner.

Moreover, the trial court repeatedly instructed the jurors

that the jury was the trier of fact and that its role was to determine credibility based on the presented evidence. (3T93:20-21; 107:19 to 108:6; 109:22 to 24.) The jury was not to consider the opening and closing statements by attorneys as evidence. (3T94:9 to 18.)  Courts have always presumed that a jury will follow the instructions of the court.  Weeks v. Angelone, 528 U.S. 225, 234 (2000);  Richardson v. Marsh, 481 U.S. 200, 211 (1987).  Therefore, any potential harms caused by the prosecutor's remarks were ameliorated by the instructions.  The Court finds that the remarks made by the prosecutor did not infect the trial with unfairness so as to deny Petitioner's right to due process.

III. Conclusion

For the foregoing reasons, Petitioner's application for federal habeas corpus relief is **denied**.

　　　　　　　　　　　　　　 S/WILLIAM G. BASSLER
　　　　　　　　　　　　　　 WILLIAM G. BASSLER, U.S.S.D.J.

Date: September 21, 2005